WMP/JPL/LRT:JPL/JPM
F. #2012R01716

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

SAMUEL MEBIAME,

             Defendant.

- - - - - - - - - - - - - - - - X

16M752

TO BE FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(T. 18, U.S.C., § 371)

EASTERN DISTRICT OF NEW YORK, SS:

        YVES HUNZIKER, being duly sworn, deposes and states that he is a Special Agent with the Internal Revenue Service, Criminal Investigations Division ("IRS-CID"), duly appointed according to law and acting as such.

        Upon information and belief, in or about and between January 2007 and June 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SAMUEL MEBIAME, together with others, did knowingly and willfully conspire to commit offenses against the United States, to wit: being a person, while in the territory of the United States, corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised, directly or indirectly, to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such

foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the defendant SAMUEL MEBIAME, and others, in obtaining and retaining business for and with, and directing business to, any person, contrary to Title 15, United States Code, Section 78dd-3(a).

(Title 18, United States Code, Section 371)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.  I have been a Special Agent with IRS-CID for more than five years. During my career as a federal law enforcement officer, I have personally participated in numerous investigations, the execution of numerous search and arrest warrants, and the debriefing of cooperating witnesses and informants, all related to various types of financial crime, fraud, and corruption. Among other federal crimes, I have investigated offenses involving conspiracies, tax fraud, mail fraud, wire fraud, bribery, and money laundering, as well as violations of the Foreign Corrupt Practices Act ("FCPA").

2.  In addition to my training and experience, I am familiar with the information contained in this complaint and affidavit based upon (i) my own personal participation in the investigation, (ii) my review of documents, records and reports, (iii)

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. In addition, where I rely on statements made by others, such statements are set forth in part and in substance unless otherwise indicated.

2

interviews of the defendant SAMUEL MEBIAME, (iv) interviews of witnesses, and (v) discussions with other law enforcement personnel.

## I. BACKGROUND

### A. The Foreign Corrupt Practices Act Generally

3. The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

### B. The Defendant

4. The defendant SAMUEL MEBIAME was a Gabonese national who worked as a consultant for a joint venture (the "Joint Venture") between a U.S.-based hedge fund (the "Hedge Fund") and a Turks & Caicos Islands incorporated entity (the "Turks & Caicos Entity") in or about and between 2007 and 2015. MEBIAME's job was to source and secure mining opportunities in Africa for the Joint Venture and one of its portfolio companies (the "Mining Company"). Prior to the formation of the Joint Venture in or about January 2008, MEBIAME worked as a consultant for the Turks & Caicos Entity and the Mining Company.

5. According to corporate records, on or about August 10, 2011, MEBIAME became a principal of Palm Island Residence, LLC ("Palm Island"), which was a Florida-registered limited liability company. According to bank records, Palm Island had business savings and checking accounts at a branch of a New York-based bank (the "Palm Island Savings Account" and "Palm Island Checking Account").

6. According to corporate records, on or about January 5, 2012, MEBIAME became a managing member of SCI GEO, LLC ("SCI GEO"), which was a Florida-registered

3

limited liability company. That same day, MEBIAME opened a business checking account in the name of SCI GEO at a branch of a New York-based bank (the "SCI GEO Account").

## II. THE CONSPIRACY

### A. Overview of the Scheme

7. The defendant SAMUEL MEBIAME worked on behalf of the Joint Venture, the Turks & Caicos Entity, and the Mining Company as a "fixer" to obtain rights to mineral concessions in Africa by routinely paying bribes to foreign government officials. MEBIAME bribed government officials in at least each of Niger, Guinea and Chad. MEBIAME personally took numerous steps while in the United States in furtherance of the scheme, including, but not limited to, sending and receiving email and other communications with coconspirators about the corrupt scheme, receiving payments related to the corrupt scheme into U.S. bank accounts he established and meeting with coconspirators to discuss the corrupt scheme.

8. The evidence of MEBIAME's corrupt scheme includes, but is not limited to, business records obtained from the Hedge Fund, e-mail messages obtained through court-authorized search warrants, corporate records, bank records, travel records, witness statements and MEBIAME's own voluntary admissions to U.S. law enforcement agents.[2]

---

[2] On or about June 17, 2015 and June 23, 2015, MEBIAME voluntarily met with federal law enforcement agents and made statements, which are recounted herein in sum and substance and in part.

4

B. **Execution of the Scheme**

9. According to MEBIAME, African politicians and government officials sought personal financial success by acquiring power within their respective governments and, in turn, control over the natural resources of their countries, which they leveraged for their own personal gain through bribery.

10. According to MEBIAME, he began working as a consultant to the Turks & Caicos Entity in or about 2003. MEBIAME reported directly to the beneficial owner of the Turks & Caicos Entity ("Coconspirator #1"), an individual whose identity is known to your deponent. According to MEBIAME's statements and e-mail records, MEBIAME began acquiring assets for the benefit of the Joint Venture in or about 2007 and began formally consulting for the Joint Venture upon its formation in or about 2008. MEBIAME was compensated, in part, by receiving money, in-kind payments for luxury goods and services and what he believed to be an economic interest in the Mining Company.

11. According to documents obtained from the Hedge Fund and bank records of the Turks & Caicos Entity and its principals, MEBIAME was paid at least $3.5 million for his work in or about and between April 2007 and June 2012. Business records indicate that MEBIAME was paid for, among other things, being "a consultant . . . [and] deliver[ing] services in Niger and Chad." According to MEBIAME, these services included the payment of bribes to officials in Chad and Niger as described in more detail below.

12. In or about June 2008, MEBIAME was asked by Coconspirator #1 to attend anti-corruption training and sign anti-corruption representations. According to MEBIAME, he told Coconspirator #1 that if he was not allowed to spend money on government officials, it would "kill" MEBIAME's business.

13. Subsequently, a dispute arose over MEBIAME's ownership interest in the Mining Company. On or about September 14, 2009, MEBIAME sent an e-mail regarding the dispute to an employee of the Joint Venture ("Coconspirator #2"), an individual whose identity is known to your deponent. Coconspirator #2 reported to Coconspirator #1. In the email, MEBIAME stated:[3]

> I am calling from wednesday international press from America and Europe as Well as African press to explain how your company is trying to delete my shares [in the Mining Company] to hide its illegal procedures to secure assets in Africa:
>
> According to the RSA[ ] laws and also English and American laws, you are not supposed to invite, commission or bribe any members of an administration were you were competing for tenders etc . . .
>
> You sistematicaly used corruption in Africa to get the assets you have.
>
> I have proofs of what i am stating and several witnesses that also feel cheated by your company are ready to testify.
>
> But more than that, i have proofs from several Bank transfers linking you directly to corruption.
>
> You even made direct and indirect payment to several people directly responsible in some African Administration for the projects you were trying to get in some African countries[.]
>
> \* \* \*
>
> If I am not given the money that i have worked for several years turning a [the Mining Company] with 0 assets to a Multi million dollar company, including giving your companies top African network that you are today using for free, i can assure you that you will also loose a lot, because i will let the world know what kind of international crooks you are[.]

---

[3] All quotations appear as in the original, without corrections or indications of misspellings or typographical errors.

14. MEBIAME resolved the dispute and continued to work on behalf of the Joint Venture, the Turks & Caicos Entity and the Mining Company, as described in more detail below. In furtherance of the conspiracy, and as described below, MEBIAME traveled to the United States and directed payments for his work to bank accounts in the United States, which he controlled as an agent of both Palm Island and SCI GEO.

i. **Niger Conduct**

15. Niger is a country in Africa. In or about and between June 2007 and November 2012, MEBIAME worked on behalf of the Mining Company, the Turks & Caicos Entity and the Joint Venture to obtain and retain rights to uranium mining concessions in Niger.

16. During an interview with federal agents, MEBIAME admitted that he acquired rights to uranium concessions by paying bribes to a high-ranking government official in Niger ("Niger Official #1"), an individual whose identity is known to your deponent, to influence another high-ranking government official ("Niger Official #2"), an individual whose identity is known to your deponent, who had the power to grant uranium mining licenses to the Mining Company and the Joint Venture. Niger Official #1 and Niger Official #2 were married to one another.

17. MEBIAME told federal agents that these bribes included, among other things: cash payments directly to Niger Official #1; payments for "nice cars;" a $100,000 payment to a charity run by Niger Official #1; payments made to and through the nephew of Niger Official #1 and Niger Official #2 ("Niger Official Intermediary #1"), an individual whose identity is known to your deponent; payments made to and through the son of Niger Official #1 and Niger Official #2 ("Niger Official Intermediary #2"), an individual whose identity is known to your deponent; and payments made through a lawyer, an individual whose identity is known

to your deponent ("Niger Official Intermediary #3"). In addition, according to MEBIAME's statements, Niger Official #1 told MEBIAME that if he helped to make Niger Official Intermediary #2 a businessperson, Niger Official #1 would arrange for the grant of one or more mining concessions as requested by MEBIAME.

18. MEBIAME's admissions concerning his corrupt conduct in Niger are corroborated by, among other things, corporate records, bank records and e-mails, which MEBIAME sent or received during the relevant time period.

19. For example, on or about July 20, 2007, MEBIAME sent Coconspirator #1 an e-mail message, which stated: "a message from our friend [Niger Official Intermediary #1] in Niger forwarding a message from [Niger Official #1]." In the message, Niger Official #1 asked for money to pay for an upcoming conference she was planning. MEBIAME wrote to Coconspirator #1 regarding a proposed reply to Niger Official #1:

> After [Niger Official #1] help[ed] us in Niger securing the Meeting with [Niger Official #2] last time, [Niger Official #1] prove us to be an efficient and very influent support for us next to [Niger Official #2].
>
> ....
>
> My suggestion is that we invite [Niger Official #1] ASAP to [South Africa] to finalise this conference issue...but the real objective behind is to show Niger Official #2 that we are making a strong contribution to [Niger Official #1's] Fondation. . . . This must happen before they take a decision on the Mining and Oil request we recently sent them.

20. One week later, on or about July 27, 2007, a senior executive at the Mining Company, whose identity is known to your deponent ("Coconspirator #3"), wrote a letter to Niger Official #1 on the Mining Company's letterhead, which stated:

> We would like to thank you for giving our Mr. Samuel Mebiame an audience. We are most pleased to be entering the mining

business in Niger, and we are most hopeful that our licenses will be issued in the coming month . . . . [The Mining Company] would be pleased to contribute $100,000 to help finance your conference.

21. Corporate records show that Niger Official Intermediary #1 set up a Niamey, Niger based company in or about July 2007 (the "Niamey Company"). Bank records show that on or about August 8, 2007, the Turks & Caicos Entity transferred $50,000 from a London-based bank account, through a correspondent account in New York, to the Niamey Company's Niger-based bank account.

22. On or about August 10, 2007, MEBIAME sent an e-mail to Coconspirator #1, discussing the availability of valuable uranium concessions, which MEBIAME ultimately secured for the Mining Company. MEBIAME informed Coconspirator #1 that "[w]e[']ll need to have a final meeting on Monday night with the Ministers man, [Niger Official Intermediary #1], to agree on the extra b[l]ock i asked to replace and that the Minister of Mine said it will be a 'good surprise.'"

23. Bank records show that on or about August 29, 2007, the Turks & Caicos Entity transferred more than $1.3 million to the Niamey Company's bank account in Niger through a correspondent account in New York. On or about September 3, 2007, MEBIAME sent an e-mail to Niger Official Intermediary #1, which included a copy of the bank transfer confirmation for the $1.3 million. Corporate records indicate that this $1.3 million transfer was purportedly for "Services Rendered."

24. During his interview with federal agents, MEBIAME stated that Niger Official Intermediary #1 became too "flashy" and was openly displaying his wealth. As a result, Niger Official #1 directed MEBIAME to cease paying Niger Official Intermediary #1 and instead pay Niger Official Intermediary #2. MEBIAME thereafter ceased payments to Niger

9

Official Intermediary #1, which according to MEBIAME made his relationship with Niger Official Intermediary #1 difficult.

25. MEBIAME began making direct cash payments to Niger Official Intermediary #2. In addition to direct cash payments, MEBIAME paid for Niger Official Intermediary #2's travel expenses. Niger Official Intermediary #2 subsequently directed MEBIAME to make payments through Niger Official Intermediary #3, who was a lawyer.

26. Corporate documents show that Niger Official Intermediary #3 was the beneficial owner of a Panama-registered company (the "Panama Company"), an entity that is known to your deponent. On or about June 11, 2008, the Panama Company submitted an invoice to an affiliate of the Mining Company for $2.7 million for services that included: "Staying by the Government of the Republic of NIGER."

27. On or about June 26, 2008, Coconspirator #3 submitted an investment memorandum for the Joint Venture to Coconspirator #1 and others, which recommended that the Joint Venture invest $3 million into a subsidiary of the Mining Company to acquire uranium concessions.

28. On or about June 27, 2008, MEBIAME received an e-mail from an affiliate of the Turks & Caicos Entity, which contained payment instructions for $2.7 million for the "negotiation of issue of [a uranium] concession ... in Niger." The next day, on or about June 28, 2008, MEBIAME sent an e-mail to Niger Official Intermediary #3, which contained the payment instructions for the $2.7 million. Bank records show that on or about July 1, 2008, the Mining Company transferred $3 million to an account, which on information and belief was controlled by Coconspirator #1. On or about July 3, 2008, $2.7 million was transferred from the Coconspirator #1-controlled account to the Panama Company's bank account.

29. In or about September 2008, Niger Official Intermediary #3 was arrested in Niger for money laundering. On or about September 25, 2008, MEBIAME sent an e-mail to Coconspirator #1 and Coconspirator #2, which stated, in part: "I then spoke to [Niger Official Intermediary #2] and later to [Niger Official #1] who told me their people could only do something on the court decision (behind the scene) but not while he was defending his case."

30. After Niger Official Intermediary #3's arrest, Mining Company employees engaged once again with Niger Official Intermediary #1. For example, on or about May 16, 2011, Niger Official Intermediary #1 sent an e-mail to Coconspirator #3, which stated that Niger Official Intermediary #1 could arrange for appointments with Niger's new Minister of Mines or "any other personality without exception when you wish."

31. On or about August 5, 2010, Niger Official Intermediary #1 sent an e-mail to Coconspirator #3, concerning the renewal of the Mining Company's licenses in Niger. In the e-mail, Niger Official Intermediary #1 wrote: "hi [Coconspirator #3], i hope you are well[.] i finish my meeting this moorning, after hard time, all thinks are settle now. the princip is accepted to renewal 6 permis of [the Mining Company]." On or about September 10, 2011, Coconspirator #3 forwarded this email to MEBIAME, who was upset that the Mining Company used Niger Official Intermediary #1 for any activity in Niger given Niger Official #1's prior instructions to stop paying Niger Official Intermediary #1 and MEBIAME's poor relationship with Niger Official Intermediary #1.

32. On or about July 31, 2011, MEBIAME traveled from Paris, France to Miami International Airport. On or about August 5, 2011, while MEBIAME was in the United States, he received a telephone call from Coconspirator #3, who asked MEBIAME to travel to Niger to meet with Niger Official #2 and propose a partnership between the Turks & Caicos

11

Entity and the Nigerian state-owned mining company. That same day, on or about August 5, 2011, Coconspirator #3 sent an e-mail from a U.S.-based e-mail account to MEBIAME's U.S.-based e-mail account, which attached two agreements that set forth the proposed partnership.

33. On or about August 6, 2011, while in the United States, MEBIAME sent an e-mail to Coconspirator #1, which stated, in part: "I received a call from [Coconspirator #3] regarding Niger situation: This is very good news as you well know. . . . [Coconspirator #3] told me I should go there with [Coconspirator #3] and the lawyers to 'Introduce' the deal to [a high-ranking government official in Niger]. . . . Before signing any documents my local partners would surely ask me how do I feet them in this Game." The e-mail continued to describe actions that MEBIAME was taking on behalf of Coconspirator #1 in Guinea (which are described below). MEBIAME signed the e-mail: "Samy from Miami!![.]"

34. On or about September 22, 2011, MEBIAME traveled from Paris, France to John F. Kennedy International Airport ("JFK"), located in Queens, New York to meet with Coconspirator #1 and Coconspirator #2 and discuss the plan for Niger, MEBIAME's role in the conspiracy going forward and the role of Niger Official Intermediary #1. E-mail records show that MEBIAME's travel agent listed the Plaza Hotel in Manhattan, New York as his residence during his stay.

35. Also on or about September 22, 2011, Coconspirator #1 traveled from Paris, France to JFK to meet with MEBIAME and Coconspirator #2.

36. On or about September 22, 2011, while in New York, MEBIAME forwarded multiple emails related to the Niger mining licenses to Coconspirator #2. The forwarded e-mails were between Niger Official Intermediary #1 and Coconspirator #3 and

12

concerned the renewal of mining licenses in Niger and meetings with various government ministers.

37. On or about September 24, 2011, MEBIAME sent an e-mail to Coconspirator #1 and Coconspirator #2, which, in part, described a meeting in New York:

> Following our conversation, at the Plazza Hotel . . ., re Niger : It worried [me] to realise that [Coconspirator #3] has still not yet explain you the reality of the situation . . . . [Coconspirator #3 had] always been in touch with [Niger Official Intermediary #1] and used [Niger Official Intermediary #1] eventhough you well knew [Niger Official Intermediary #1] was trying to bring me down convinced that i was an obstacle for [Niger Official Intermediary #1] with [the Mining Company].

38. During an interview with federal agents, MEBIAME stated that he and Niger Official Intermediary #1 met in order to make peace and work with one another. Subsequently, on or about September 24, 2011, Niger Official Intermediary #1 forwarded an e-mail to MEBIAME, which stated:

> The Commission has sent a letter to the Ministry of Mines and Energy, asking the Minister to suspend 27 permits, all the 9 permits of [the Joint Venture] as a punishment for their having paid bribes. The 9 permits of [the Joint Venture] include the 6 permits of [the Mining Company] . . . . I am trying to figure out how to stop this process and it may require time.

39. According to corporate documents and e-mails, employees of the Hedge Fund and of the Joint Venture continued to seek license and permit renewals for the Mining Company's existing uranium concessions in Niger until at least November 2012.

### ii. Guinea Conduct

40. Guinea is a country in West Africa with significant mineral resources, including bauxite, iron ore, diamonds, and gold. In or about and between June 2010 and June 2012, MEBIAME engaged in negotiations for mineral rights and opportunities on behalf of

13

Coconspirator #1 and the Turks & Caicos Entity, including the opportunity to be partners with a Guinean state-owned mining company (the "SOMC"). MEBIAME sent e-mail messages to Coconspirator #1, which stated that he (MEBIAME) had "exclusivity" over such opportunities in Guinea. According to MEBIAME, a senior Guinean government official ("Guinea Official #1"), an individual whose identity is known to your deponent, requested MEBIAME's assistance in setting up the SOMC.

41. E-mail records show that in or about and between February and March 2011, Coconspirator #1 and MEBIAME, among others, were involved in re-writing the Guinean mining code. Coconspirator #1 and MEBIAME prepared and transmitted draft correspondence, to be printed on "Republic of Guinea Conakry Letterhead" and signed by a Guinean minister, which would be used to notify existing permit holders of legal issues with their mining permits.

42. In or about March 2011, a company controlled by Coconspirator #1 entered into an agreement with the Guinean government, which gave the company the option to buy into the SOMC. On or about April 29, 2011, an affiliate of the Turks & Caicos Entity loaned the government of Guinea $25 million as part of a deal to become a partner in the SOMC. Coconspirator #1 raised the $25 million through a related-party stock sale to the Joint Venture. MEBIAME signed the loan document on behalf of the affiliate of the Turks & Caicos Entity. According to MEBIAME, the partnership with the SOMC ultimately did not go forward due to negative press accounts, which indicated that the deal between the Guinean government and Coconspirator #1 was corrupt.

43. During his interview with federal agents, MEBIAME stated that he had special access to mining opportunities in Guinea because of payments he provided to senior government officials in Guinea in exchange for such access. For example, in 2010, MEBIAME

14

provided an S-class Mercedes Benz sedan to a candidate for high political office in Guinea, who was later elected and became Guinea Official #1. E-mail messages sent and received by MEBIAME show that on or about March 15, 2011, MEBIAME arranged to pay $440,000 to rent a private Airbus jet for Guinea Official #1's use.

44. MEBIAME told federal agents that his financial support to Guinean government officials included, but was not limited to, approximately $100,000 to $200,000 in cash payments provided by MEBIAME to another senior Guinean Government Official ("Guinea Official #2"), an individual whose identity is known to your deponent. MEBIAME said that Guinea Official #2 arranged a secret meeting with the heads of the SOMC and provided MEBIAME secret information, which provided MEBIAME leverage in negotiations with the government.

45. Bank records corroborate MEBIAME's statements and show that on or about June 29, 2011, MEBIAME arranged for the transfer of approximately $150,000 to Guinea Official #2.

46. On or about August 6, 2011, MEBIAME, while in the United States, sent an e-mail to Coconspirator #1, which stated, in part:

> "New team" is doing lots of progress as they all went to Guinee last friday and had several meetings with [Guinea Official #1] specificly regarding our Group. Following those meetings essentialy to clarify our Business position, [Guinea Official #1] instructed the Minister of Mines to meet them and to call me all together: which they did. Minister of Mines actualy sent you is best regards and asked me to tell you that you ll now be fine.. The outcome looks very interesting as they clearly asked me on the phone what could they give us immediatly: [mining concessions] etc .. difficult to answear for me ..It is clear now that the "New team" has cleaned the mess there and re-explain [Guinea Official #1] how important it is to re organise the relation with us by also keeping [Guinea Official #1's] word . it also makes no doubt now that we ( you and me ) will have to go there soon to finalise that

15

"asset identification and allocation strategy"" that i have put in place and asked "New team" to impliment.

47. Bank records, e-mails and MEBIAME's statements show that between 2011 and 2012, MEBIAME provided additional in-kind payments to Guinean government officials including, but not limited to: (a) business class airfare to Paris for Guinea Official #2; (b) a first-class upgrade for Guinea Official 1's son; and (c) hotel arrangements for Guinea Official #2 worth approximately $1,100.

48. According to a consultancy agreement executed between the Turks & Caicos Entity and an entity controlled by MEBIAME, the Turks & Caicos Entity agreed to pay MEBIAME a fee of at least $1 million and to reimburse "all costs, expenses and overheads" for MEBIAME's work in Guinea.

49. Bank records and e-mails sent by MEBIAME show that he used at least one of his U.S. companies to receive payments for his work in Guinea. In addition, MEBIAME told federal agents that he used the money he received from the South African Entity to purchase a house in Miami, Florida.

50. On or about September 28, 2011, the Palm Island Checking Account received a wire transfer of $20,000 from a Turks & Caicos Entity bank account. On or about November 9, 2011, the Palm Island Checking Account received a wire transfer of $82,200 from a bank account in the name of Coconspirator #1.

51. On or about March 21, 2012, the SCI GEO Account received a wire transfer for $60,000 from a Turks & Caicos Entity bank account.

52. On April 17, 2012, MEBIAME sent an e-mail to Coconspirator #2, which asked Coconspirator #2 to "transfer to SCI GEO at CHASE BANK MIAMI my fees for my work done in January 2012 in Conakry. This fee is for a total amount of: Euros 50[,]000." "Conakry"

16

is the capital city of Guinea. On or about April 23, 2012, the SCI GEO Account received a wire transfer for $64,710 from a Turks & Caicos Entity bank account.

53. On or about May 22, 2012, MEBIAME, while located in the United States, sent an e-mail to an associate of Coconspirator #1, which stated: "Please transfer USD 100 000 to SCi Geo. Account in Miami." On or about May 23, 2012, the SCI GEO Account received a wire transfer of $100,000 from a Swiss-based bank account held in the name of Coconspirator #2. On or about July 20, 2012, the SCI GEO Account received a wire transfer of $25,000 from a Turks & Caicos Entity bank account.

54. On or about May 28, 2012, while in the United States, MEBIAME received an e-mail from a personal assistant to Coconspirator #1, which stated: "Dear Samy Please see attached from [Coconspirator #1]," and which included an earlier e-mail that was originally addressed to Coconspirator #1 and Coconspirator #2. The forwarded e-mail concerned a bet for a watch between Coconspirator #1 and Coconspirator #2 as to whether the United States could assert jurisdiction under the FCPA solely based on the use of correspondent banks in the United States to clear transactions denominated in U.S. Dollars.

55. Bank records show that MEBIAME transferred proceeds he received in connection with his work in Guinea to U.S.-based bank accounts. For example, on or about November 25, 2011, MEBIAME transferred $44,880 from a bank account in Cyprus, which received fees for his work in Guinea, to a New York-based bank account held in the name of MEBIAME.

### iii. Chad Conduct

56. Chad is a country in central Africa. According to corporate records, in or about and between January 2007 and June 2008, MEBIAME obtained the rights to uranium

17

concessions and explored other possible natural resource opportunities in Chad on behalf of the Mining Company and the Joint Venture.

57. During an interview with federal agents, MEBIAME stated that he was "a one man show" in Chad who singlehandedly obtained uranium concessions for the Mining Company. MEBIAME was introduced to a high-level government official in Chad ("Chad Official #1"), an individual whose identity is known to your deponent, by a local businessman ("Coconspirator #4"), an individual whose identity is known to your deponent. Chad Official #1's official duties included advising the President of Chad on mining matters and awarding mining rights to companies.

58. MEBIAME also admitted to federal agents that he paid bribes to Chad Official #1 to obtain the uranium concessions on behalf of the Mining Company and Joint Venture. MEBIAME stated, among other things, that Chad Official #1 was an "expensive person." MEBIAME also stated that he gave Chad Official #1 cash and paid for travel expenses and shopping excursions for Chad Official #1 and Chad Official #1's spouse in Paris, France.

59. Additionally, MEBIAME told federal agents that he was able to acquire uranium concessions for the Mining Company and Joint Venture through Chad Official #1's influence and official action, which included, among other things, signing mining licenses and stripping other mining companies of their rights to award them to the Mining Company. MEBIAME's admissions are corroborated by e-mails he sent or received during the relevant period.

60. For example, on or about September 18, 2007, MEBIAME received an e-mail from a coconspirator, an individual whose identity is known to your deponent, which stated:

"No one is disputing [Coconspirator #4's] role in facilitating initial contact with the Chadian government – for which a consideration was advanced to him and [Chad Official #1]."

61. On or about April 23, 2008, an employee of the Hedge Fund, whose identity is known to your deponent, and Coconspirator #3 submitted an investment memorandum to a senior executive of the Hedge Fund, an individual whose identity is known to your deponent, and Coconspirator #1, which recommended a $10 million investment to acquire additional uranium concessions in Chad. According to the investment memorandum, the uranium concessions had been stripped by the government of Chad from a French-owned and Canadian-based mining company (the "Canadian Mining Company") approximately one month earlier. MEBIAME told federal agents that he persuaded Chad Official #1 to strip the Canadian Mining Company of its assets so the assets could subsequently be awarded to the Mining Company.

62. On or about February 14, 2009, MEBIAME sent an e-mail to Coconspirator #1 and Coconspirator #2, which discussed MEBIAME's work in Chad. The e-mail stated in part:

> CHAD , I agreed to fly the day that the war started with Sudan, to controversialy reverse the situation by convincing the Government to allocate to [the Mining Company] the potentially best block of the country that was ALREADY the property of [the Canadian Ming Company]: This resulted in the fury of [Foreign President] during his visit to CHAD PRESIDNT . . . . To please the [foreign nation], the CHAD deciders had no choice but to fire both [Chad Official #1], and [another Chad government official]: Those two men hold today very minor positions in Government for having helped us on a very dangerous ground[.]

### III. CONCLUSION

63. I have been informed by an Assistant United States Attorney that Chad Official #1, Niger Official #1, Niger Official #2, Guinea Official #1 and Guinea Official #2 were

"foreign officials," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant SAMUEL MEBIAME so that he may be dealt with according to law.

IT IS FURTHER REQUESTED that, because public filing of this document at this time could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, all papers submitted in support of this application, including the complaint and arrest warrant, be sealed until further order of the Court.

YVES HUNZIKER
Special Agent
Internal Revenue Service,
Criminal Investigations Division

Sworn to before me this
/2-th day of August, 2016

THE UNI...
EAS...
JUDGE
ORK